Laurence M. Rosen
THE ROSEN LAW FIRM, P.A.
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3927
Email: lrosen@rosenlegal.com

Counsel for Plaintiffs

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JIHONG WANG, QI LI, LES AKIO OMORI, and ALAN BECK, Individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CHINA FINANCE ONLINE CO. LIMITED, ZHIWEI ZHAO, JUN WANG, RONGQUAN LENG, NEO CHEE BENG, KHENG NAM LEE, GRANT THORNTON (CHINA), and BDO CHINA SHU LUN PAN CERTIFIED PUBLIC ACCOUNTANTS LLP,<br><br>Defendants. | Case No: 15-cv-7894-RMB<br><br>**[CORRECTED] CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Lead Plaintiffs Jihong Wang, Qi Li, and Les Akio Omori, and named plaintiff Alan Beck ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their complaint against Defendants, allege the following based upon personal knowledge as to themselves

and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding China Finance Online Co. Limited, ("China Finance" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired China Finance American Depository Shares (the "ADS")[1] between April 29, 2013 and June 3, 2015, both dates inclusive, and did not sell such shares prior to June 3, 2015 (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2. China Finance is a U.S.-listed company whose operations take place in the People's Republic of China ("PRC").

3. Until recently, China Finance earned most of its revenues from selling subscription services to a financial news services. But in a much touted strategic transition beginning April 2012, China Finance shifted its main product line to offering securities, commodities, and precious metals brokerage services.

[1] Each ADS entitles the holder to 5 shares of China Finance's Hong Kong incorporated common stock. China Finance's common stock is not publicly traded.

4. When it announced its strategic transition, China Finance stated that it would need "ample" cash to succeed. It accordingly said it intended hold on to this cash.

5. But in April 2013, China Finance announced that it had invested about $22.1 million of its $70 million of cash in Langfang Development,[2] a company engaged in a real estate development project. China Finance had no intention of entering the real estate business. Rather, the only reason China Finance provided for the investment was that it wanted to boost returns on its cash it was holding on to for its transition to being a securities broker.

6. China Finance announced that the real estate developer was owned by four individual investors who each held 25% of its shares. Unbeknownst to China Finance's investors, three of the four were merely strawmen who promptly transferred their shares after China Finance's investment to Beijing Bluestone.[3] Beijing Bluestone's owners were Defendant Zhiwei Zhao, China Finance's CEO, and China Finance's long-time former director, Ling Wang.

7. The real estate project is but one of Zhao and Wang's numerous business projects. Zhao and Wang run their various business projects as an invisible conglomerate, transferring personnel between the ventures, sharing office space, and using the ventures' assets for benefit of others – including by using China Finance's cash to support their personal real estate business.

8. Had China Finance disclosed Zhao and Wang's interest as required by the securities laws, China Finance investors would have been able to determine for themselves whether the true purpose of the investment was to boost returns – or to assist Zhao and Wang's moonlighting for personal gain. Thus, China Finance's financial statements were misleadingly incomplete.

---

[2] Its full name is Langfang Shengshi Real Estate Development Co., Ltd.

[3] Its full name is Beijing Qingshi Investment Management Co., Ltd. a/k/a Beijing Bluestone Investment Management Co., Ltd.

9. Moreover, U.S. generally accepted accounting principles ("GAAP") and SEC regulations require that companies disclose related party transactions. These include transactions with companies owned by management, transactions with entities under common control, transactions with entities that exert significant influence over the reporting entity, or transactions with entities over which the reporting entity exerts significant influence. China Finance's co-investor in the real estate project was a related party, and all transactions with it had to be disclosed as related party transactions.

10. An investment into a risky illiquid real estate project makes no sense for a company that will need to access its cash. But China Finance's Board nonetheless authorized this highly suspicious real estate transaction.

11. What followed is an object lesson in what happens when a company extends sweetheart deals to its management and their partners.

12. In November 2013, China Finance sold 75% of its interest in Langfang Development to Beijing Bluestone, and sold 25% of its interest to Langfang Great Sky Investment Co. Ltd. ("Langfang Great Sky"). The sale price was $24.9 million, payable in one installment of $16.4 million in December 2013, and another installment of $8.5 million in March 2014. But Beijing Bluestone and Langfang Great Sky did not make the required payments. Instead, they paid China Finance $11.5 million in December 2013, and as this Complaint is filed, have made no further payments. And at the same time as it sold its interest in Langfang Development, China Finance extended Langfang Development a $10.3 million loan, also due by March 2014, only $2.1 million of which has been collected, further benefiting Zhao personally. Thus, China Finance has received about $3.3 million (net) from selling its investment in Langfang Development, leaving it with an $18.8 million cash loss on the investment.

13. On September 29, 2014, after close of trading, China Finance disclosed its Q1 2014 financial results. They were positive. But China Finance also

disclosed that it had extended the due date on the loan and sale proceeds from September to December. The markets began to realize that the by-then $25 million China Finance was owed (including interest) could very well be gone for good. China Finance's stock price fell from $8.75/ADS to $5.89/ADS, damaging investors.

14. In October 2014, in response to the SEC's demand that it disclose the information, China Finance disclosed to investors that Beijing Bluestone was one of the parties to whom China Finance had transferred its interest in November 2013. Then, on December 15, 2014, a news publication run by a prominent Chinese media company issued an exposé of a corruption investigation that had swept up Wang and Zhao. The article claimed that Wang and Zhao were frequent business partners, and that one of their investment vehicles was Beijing Bluestone. The markets then surmised that it was the same entity in which China Finance had invested $22.1 million back in April 2013 and that it was an undisclosed related party transaction to Zhao and his business partner, making collection unlikely. In response, China Finance's stock price fell from $7.52/ADS to $5.70/ADS.

15. On March 23, 2015, after close of trading, China Finance issued a press release announcing its financial results for the year ending December 31, 2014. The financial statements in the release disclosed that the real estate developer had blown past the December 2014 due date without paying any of the $25 million it owed China Finance. The markets lost more confidence in China Finance's ability ever to collect the $25 million, and China Finance's stock price fell from $6.19/ADS to $4.58/ADS.

16. Then, on June 3, 2015, analyst firm GeoInvesting LLC published a report calling into question the integrity of China Finance's management. Among other things, GeoInvesting's report published filings made by Beijing Bluestone and Langfang Development proving that Beijing Bluestone had been partly owned

by Wang and Zhao when China Finance made its investment. As a result, China Finance's stock price fell from $5.95/ADS to $4.67/ADS, damaging investors.

17. Unless a company tells them otherwise, investors reasonably expect that major transactions with related parties are disclosed so that investors can take the related-party nature into account when considering their investment. And here, China Finance concealed the related party nature of its real estate investment and misleadingly told investors that its purpose was to boost returns. The board of directors approved an inherently suspicious transaction without conducting an adequate investigation.

18. China Finance's 2013 auditor was Grant Thornton (China), and its 2014 auditor was BDO China.[4] Each certified that they had audited China Finance's financial statements in accordance with PCAOB auditing standards. But accounting rules mandate disclosure of related-party transactions in the company's financial statements, and the auditing standards that governed Grant Thornton and BDO's audits set out steps they must follow to obtain a list of related parties. These steps included carefully investigating unusual or suspicious transactions – like China Finance's real estate investment – and checking public records to determine whether there are any related parties that management had not disclosed. Grant Thornton and BDO did not follow these auditing standards, because they did not check public records showing that Beijing Bluestone was owned by China Finance's management even given all the reasons why it was a suspicious transaction. And BDO issued its audit report even after a media article revealed that Beijing Bluestone was owned by China Finance's management. Thus, Grant Thornton and BDO's statements that their audit had comported with auditing standards were false.

## II. JURISDICTION AND VENUE

[4] Its full name is BDO China Shu Lun Pan Certified Public Accountants LLP

19. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

20. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

21. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) as the alleged misleading public filings and press releases entered this district.

22. In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## III. PARTIES

23. Lead Plaintiffs Jihong Wang, Qi Li, and Les Akio Omori, as set forth in their Certifications which were previously filed and are incorporated by reference, acquired China Finance securities at artificially inflated prices during the Class Period and were damaged thereby.

24. Plaintiff Alan Beck, as set forth in his PSLRA Certification filed as an Exhibit to this Complaint and incorporated by reference, acquired China Finance securities at artificially inflated prices during the Class Period and was damaged thereby.

25. Defendant China Finance is a Hong Kong corporation with its principal executive offices located at 9th Floor of Tower C, Corporate Square NO.35 Financial Street, Xicheng District Beijing 100033, China. China Finance's ADSs are actively traded on the NASDAQ Global Market ("NASDAQ") under the ticker symbol "JRJC."

26. Defendant Zhiwei Zhao ("Zhao") has been serving as China Finance's Chief Executive Officer since 2005 and as Chairman of its Board of Directors since April 2012.

27. Defendant Jun (Jeff) Wang ("J. Wang") has been serving as China Finance's Chief Financial Officer since 2006. J. Wang holds a Master of Economics in Accounting from Beijing Technical and Business University, is a member of the U.S. Certified Management Accountants, and is a CFA.

28. Defendant Rongquan Leng ("Leng") served as China Finance's director from April 2012 to April 17, 2015, when it was announced that he had been arrested and taken into custody on corruption charges. Leng was on China Finance's Board when it approved the Langfang Investment. Leng sat on China Finance's audit, compensation, and nomination committees.

29. Defendant Neo Chee Beng ("Beng") has served as a director and on China Finance's audit committee since January 2012. Beng was on China Finance's Board when it approved the Langfang Investment. Beng is a fellow of the Association of Chartered Certified Accountants, United Kingdom.

30. Defendant Kheng Nam Lee ("Lee") has served as a director and on China Finance's audit committee since 2004. Lee was on China Finance's Board when it approved the Langfang Investment.

31. Zhao, J. Wang, Leng, Beng, and Lee are sometimes referred to herein as the "Individual Defendants."

32. The audit committee's responsibilities include:

> [R]eviewing and approving all proposed related-party transactions, as defined in Item 404 of Regulation S-K under the U.S. securities laws; [] [D]iscussing with management and the independent registered public accounting firm major issues regarding accounting principles and financial statement presentations; reviewing reports prepared by management or the independent auditors relating to significant financial reporting issues and judgments; [and] [R]eviewing major issues as to the adequacy of [China Finance's] internal controls and

any special audit steps adopted in light of material control deficiencies.

Source: 2013 20-F, at 83-84.

33. Defendant Grant Thornton (China) was China Finance's auditor for the years ended December 31, 2012, and December 31, 2013. Grant Thornton's principal offices are located at 5F Scitech Place, 22 Jianguomen Wai Avenue, Beijing, Beijing 100004.

34. Defendant BDO China Shu Lun Pan Certified Public Accountants LLP ("BDO China") was China Finance's auditor for the year ended December 31, 2014. BDO China's principal offices are located at 4F, No. 61 East Nanjing Road, Shanghai, Shanghai 200002.

35. BDO China and Grant Thornton are the "Auditor Defendants".

## IV. BACKGROUND

### A. Zhiwei Zhao and Ling Wang are close business partners.

36. China Finance's IPO took place in October 2004. Ling Wang ("Wang") had become a director of China Finance even before then, in May 2004. Throughout his tenure, he served as a member of China Finance's audit, compensation, and nominations committees. He stayed on until he resigned in May 2012, citing personal reasons.

37. For some time now, Wang and Zhao have been business partners who have jointly managed several separate businesses.

38. First, as set out more fully below, Wang and Zhao were joint owners of Beijing Bluestone Investment Management Co., Ltd. (a/k/a Beijing Qingshi Investment Management Co., Ltd. a/k/a ("Beijing Bluestone") during the period from September 2010 to July 2013.[5]

[5] Specifically, between September 2010 and February 2012, Zhao owned 20% and Wang 40% of Beijing Bluestone, and between February 2012 and July 2013, Zhao owned 20% and Wang 80% of Beijing Bluestone.

39. Second, according to a December 15, 2014 article by Tencent (the "Tencent Exposé"), Wang and Zhao are, respectively, the largest and second-largest shareholders of Beijing Yikai Holding Co., Ltd. ("Yee Care"), reportedly China's largest online health product and nutritional supplement wholesaler. Plaintiffs obtained regulatory filings made by Yee Care with the State Administration for Industry and Commerce (the "SAIC"), which confirmed that Wang and Zhao hold, respectively, 68.6% and 17.1% of Yee Care's shares.

40. Third, according to SAIC records, Zhao and Wang are connected through numerous other companies:

a. Wang is the legal representative of Beijing Shitonbeijian Trading Co. Zhao owns 20% of its shares. Wang owns the remaining 80%.

b. Wang, Zhao, and Wangcheng Ling ("Ling") were contemporaneously directors of Beijing Jifude Information Technology Co., Ltd., a large company with registered capital of nearly 33.78 million RMB.

c. Wang and Zhao are two of the six shareholders of Watekaiyuan (Beijing) Information Technology Co., Ltd.

d. Wang and Zhao, through Beijing Bluestone, owned up to 75% of Langfang Shengshi Real Estate Development Co., Ltd. ("Langfang Development").

41. Yee Care sells nutritional supplements and health products; China Finance sells financial news and provides brokerage services; Langfang Development is a real estate developer; and Beijing Bluestone is an investment fund. The four businesses should have little in common. But their common affairs show how Wang and Ling run all of their businesses as one invisible conglomerate:

a. ***The companies share personnel***. For example, Jun Ning, China Finance's CEO before Zhao, immediately joined Yee Care when he left China Finance. Wang Dong, Yee Care's CEO from 2005 to 2009,

came to Yee Care from China Finance. And Jingwei Yuan, a China Finance vice CFO, has also been Yee Care's CFO.

b. ***The companies share office space***. In the month of October, 2015, Plaintiffs' Investigator visited Beijing Bluestone's SAIC-registered address, on the 6th floor of Qingyun Plaza, No. 9 building of Qingyun Li, Haidian District, Beijing. Beijing Bluestone had no office on that floor. But Yee Care did.

c. ***The companies share cash***. As set out in more detail below, one of Beijing Qingshi's investment projects was a real estate development, Langfang Development. But Langfang Development needed cash to put in a bid and develop a real estate complex. Wang and Zhao simply made China Finance invest $22.1 million in the project.

42. Thus, China Finance is just one of the many companies that form part of Wang and Zhao's business relationship.

## B. Both GAAP and SEC regulations mandate disclosure of related-party transactions.

### i. Regulation S-K

43. SEC Regulation S-K (27 CFR 229.10) requires that annual reports such as those filed by China Finance on Form 20-F comply with the other requirements of Regulation S-K "to the extent provided in the forms and rules under [the Exchange] Act." 17 C.F.R. 229.10.

44. Form 20-F requires disclosure of transactions with related parties. Item 7.B. Related parties are defined to include:

a. The company's transactions with entities that are 10% owned, directly or indirectly, by any of the company's key management, Item 7.B (d), (e).

b. The company's transactions with entities in which its management holds significant influence, meaning the power to participate in the financial and operating policy decisions of the entity.

c. The company's transactions with entities that "directly or indirectly through one or more intermediaries, control or are controlled by, or are under common control with, the company."

45. Under SEC regulations, all related party transactions that are material or unusual in their nature or conditions must be disclosed.

**ii. GAAP**

46. GAAP constitutes those standards recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.

47. The SEC has the statutory authority to promulgate GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board (the "FASB").

48. SEC and NASDAQ rules and regulations require that publicly traded companies such as China Finance include financial statements that comply with GAAP in their annual and quarterly reports filed with the SEC. Sections 12 and 13 of the Exchange Act; Rule 10-01(d) of Regulation SX.

49. SEC Rule 4-01(a) of Regulation S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1) (emphasis added).

50. Within auditing standards, an *arm's length transaction* is defined as a "transaction conducted on such terms and conditions between a willing buyer and a willing seller who are **unrelated and are acting independently of each other and pursuing their own best interests**." (AU-C 550.10, emphasis added).

51. GAAP Statement of Financial Accounting Standards ("SFAS") requires disclosure of all material transactions between the company, China Finance, and related parties. SFAS No. 57 ¶ 2; 850-10-50-1.

52. "Related parties" include

a. Management of the company;

b. Parties that can significantly influence the company, China Finance, to the extent that the entity might be prevented from fully pursuing its own separate interests;

c. Parties that the company, China Finance, can significantly influence to the extent that the party might be prevented from fully pursuing its own separate interests; and

d. The company's affiliates, including entities that through one or more intermediaries, control, are controlled by, or are under common control with the company.

SFAS No. 57 ¶ 1; ASC 850-10-20.

53. "Control" includes "[t]he possession, direct or indirect, of the power to direct or cause the direction of the management and policies of an enterprise through ownership, by contract, or otherwise."

54. Disclosures of related party transactions shall include (a) the nature of the relationship involved, (b) a description of the transactions for each period for which income statements are presented and such other information necessary to an understanding of the effects of the transactions on the financial statements, (c) the dollar amount of transactions for each of the periods for which income statements are presented, and (d) amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement. SFAS No. 57 ¶ 2; 850-10-50-1.

**C. The AIC.**

55. Among other functions, the national Administration for Industry and Commerce (the "AIC") and its various provincial and municipal lower-level analogs (the "SAICs") exist to register share ownership of all companies in the PRC.

56. Entities, including China Finance's subsidiaries, Beijing Bluestone, and Langfang Development, must make filings with the SAIC. Every change in share ownership, to be effective, must timely be registered with the AIC or SAIC.

57. As PRC licensed auditors, BDO China and Grant Thornton had access to AIC and SAIC filings setting out current and historical ownership of all reporting companies, including of Beijing Bluestone and Langfang Development.

58. Accordingly, a company's SAIC filings are the presumptive document to consult to determine its share ownership.

## V. DEFENDANTS' FALSE STATEMENTS

### A. China Finance preserves its cash for a strategic transition.

59. China Finance offers a suite of web-based financial services to individual investors in China, and brokerage services.

60. Since its IPO in 2004, China Finance had derived its revenues from selling paid subscriptions. The services include news, data, analytics, and securities investment advisory services.

61. In its 2011 20-F, China Finance announced that it would transition to providing fee-based securities investment advisory and wealth management services, a transition which began in April 2012.

62. As of the end of 2011, China Finance had accumulated about $94.5 million in cash, cash equivalents, and restricted cash. But China Finance admitted that "ample cash is critical for ensuring the success of the strategic transition." 2011 20-F, at 39. China Finance stated that for this reason, it would preserve its cash balance during the transition. *Id.*

### B. China Finance omitted to disclose the related party nature of its $25 million investment in Langfang, namely that Langfang Development was 75% owned by China Finance's CEO Zhao and his business partner through strawmen.

63. The Class Period begins on April 11, 2013. That day, after trading closed, China Finance announced its financial results for the year ended December 31, 2012. In the press release announcing the results, China Finance announced that it had made an RMB 135 million (about $22.1 million) investment in a real estate development in Langfang City (the "Langfang Investment"):

> In March, 2013, in order to enhance our return on cash, the Company's Board of Directors approved and authorized the Company's participation in a real estate project in Langfang City of Hebei Province. The project is strategically located near the new Capital International Airport, serving the Beijing metropolitan area. Pursuant to the investment agreement entered into in connection with the real estate project, the Company will own 49% of the equity interest of Langfang Shengshi Real Estate Development Co., Ltd. [i.e., Langfang Development] with a consideration of RMB135 million at closing. The Company does not intend to engage in real estate investment as part of our business operation.
>
> Source: Press Release announcing 2012 financial results (the "2012 Earnings Release")

64. In a conference call that same day to discuss China Finances 2012 results (the "2012 Earnings Call"), Defendant Wang stated:

**Unidentified Analyst**

> [] Can you tell us a little more about Langfang [Development]?
>
> **Jun Wang** - CFO
>
> Hi, thank you Alex. Well I will start off by saying that ***the purpose of such investment is to enhance the return of our liquid capital***. So down the road we'll stick to [indiscernible] for investment return and have no plans of engaging in real estate project as part of our operations. And now let me give you some background information on this project. Located near the central area of Bohai economic circle, in the greater Beijing metropolitan area, this project actually will be the first government style [ph] upscale residential project in Langfang City of Hebei Province. And the project is only 12 kilometers away from the new Capital International Airport, which is already under construction. And that is 80 kilometers from the current

> Beijing Capital International Airport and 100 kilometers from the Port of Tianjin with excellent location of access.
> And in late March this year, the Board of China Finance Online approved company's purchase of 49% from the Shengshi, this real estate project which is developer of this project for consideration of RMB135 million. The fund will be mainly used for the payments of land transfer and offer the project liquidity. The development in Langfang City of this project on state-owned construction land of about 400,000 square meters has been approved by the Hebei Provincial Department of Land and Resources.

65. China Finance's board approved the Langfang Investment in March of 2013.

66. The Langfang Investment was structured as an investment into a land development company, Langfang Shengshi Real Estate Development Co., Ltd. ("Langfang Development"), alongside existing Langfang Development investors.

67. The Langfang Investment closed on March 19, 2013. The amounts were material. As of December 31, 2012, China Finance had $69.7 million in cash and cash equivalents and restricted cash, meaning that its $22.1 million cash investment in Langfang accounted for 31% of its total cash, and 18.3% of its $121 million of *total* assets.

68. China Finance is a financial news service and securities and commodities broker. China Finance had no intention of entering the real estate business. Rather, according to China Finance, the purpose of the investment was to earn a return on its cash during its strategic transition, while continuing to be able to access it. China Finance 2013 20-F, at 18.

69. The Langfang Investment made no sense in this plan because, among other things, it was illiquid. First, China Finance's investment was necessary to purchase the land rights to begin construction of the Langfang Investment, meaning that the project had not even begun when China Finance invested and any sale of properties was still years away. Second, there would be no secondary market for an investment in a specific real estate project. Third, while China Finance had a put option to sell its interest back to Langfang Development if

certain conditions were met, if the other investors did not pay China Finance, its remedy was the right to buy them out. If Langfang Development did not have $22.1 million available to buy them out or if it could not find a ready buyer for the Longfang Development, China Finance would not get its money back. And fourth, China Finance purportedly tried to get its money back in November 2013, in a contract that provided that it would be fully repaid by March 2014. As this Complaint is filed, it has only recovered $3.3 million, net of an additional $10.3 million it loaned to Langfang Development. Thus, China Finance's Langfang Investment was illiquid, as it acknowledged by accounting for the investment as a long term investment.

70. Thus, China Finance's Langfang Investment was not in the best interests of China Finance, since the very reason it held on to its cash was so that it could access it during its transition. The investment's true undisclosed purpose was not to benefit China Finance – but rather, to benefit Wang and Zhao.

71. Upon execution of China Finance's investment, China Finance owned 49% of Langfang Development. According to Langfang Development's SAIC Filings, prior to China Finance's investment, four individual investors (Yiyong Wang, Yan He, Haimin Xu, and Jiantao Zhan) each held 25% of Langfang Development's shares. It is apparent that Yiyong Wang, Yan He, and Haimin Xu were strawmen, for the following reasons, among others:

a. On July 16, 2013, according to Langfang Development's SAIC filings, three of the investors, Yiyong Wang, Yan He, and Haimin Xu, transferred their shares to Beijing Bluestone. [6]According to Beijing Bluestone's SAIC Filings, Beijing Bluestone was 80% owned by

---

[6] Langfang Development SAIC Filings are corroborated by an agreement China Finance eventually filed with the SEC, referred to in this Complaint as the Langfang Transfer Agreement. In its recitals, the Langfang Transfer Agreement recounts each individual investor's transfer.

Wang at the time of the Langfang Investment, and 20% owned by Zhao. Thus, Zhao and Wang would have faced scrutiny if they had disclosed true beneficiary of China Finance's $22.1 million investment in Langfang Development;[7]

b. One of Langfang Development's strawman shareholders, Xu, was the chair of Beijing Bluestone's Board of Directors from its inception until July 2013. Xu had also previously acted as a strawman for Wang and Zhao, holding on to 40% of Beijing Bluestone's shares for just August to September 2010 just before Wang and Zhao came to own 60% of Beijing Bluestone's shares.

c. China Finance sought to conceal that the individual strawmen investors had transferred their interest to an entity owned by Wang and Zhao. China Finance sold its stake in Langfang Development through an agreement referred to in this Complaint as the Langfang Transfer Agreement. In violation of SEC rules, China Finance omitted to publicly file the Langfang Transfer Agreement until the SEC demanded its filing. The Langfang Transfer Agreement recounts the individual investors' transfers in its recitals; and

d. The Langfang Investment contained a clause requiring that any would-be transferor obtain the express written consent of all Langfang Development investors.[8] Thus, China Finance would have had to consent in writing to the transfer of 38.25% of Langfang Development to Beijing Bluestone, a related party. As further set out below, China

[7] Beijing Bluestone's SAIC Filings are corroborated by the Tencent Exposé, which reported that in 2010, Wang had invested RMB 40 million (about $6 million) for a 40% stake in Beijing Qingshi. Since then, he had steadily increased his ownership. By the time of China Finance's investment into Langfang, Wang owned 80% of Beijing Qingshi, and Zhao owned the remaining 20%.

[8] As stated in the document defined in this Complaint as the Summary, Cl. 5. (3).

Finance's code of ethics required that the company's officers obtain Audit Committee's prior written approval for any joint venture with China Finance.

72. The fourth investor, Zhan, likely was under Beijing Bluestone's control as well. According to a January 11, 2015 Sina.com article, Zhan was Beijing Bluestone's representative on the board of Hengsheng Bluestone Real Estate (Beijing) Co. Ltd., a large real estate company, from its inception in May 2011 to its dissolution in March 2014. And in April 2014, Zhan's 98%-owned entity Langfang Great Sky invested RMB 35 million in a joint venture with just it and Beijing Bluestone; Beijing Bluestone's investment in the joint venture was RMB 65 million.

*Ownership of Langfang Development before China Finance's Langfang Investment*



*After China Finance's Langfang Investment*




73. Accordingly, this Complaint refers to the three initial individual investors who transferred their shares to Beijing Bluestone as the Strawmen.

74. Thus, the Langfang Investment was into a company that was indirectly at least 15% owned by its CEO Zhao and at least 60% owned by Zhao's business partner Wang.

75. Thus, China Finance's statements about its Langfang Investment in the 2012 Earnings Release and 2012 Earnings Call were misleading because they omitted to disclose (a) the transaction was not at arm's length, but rather with a related party; and (b) one of the purposes of the transaction was to support Ling Wang and Zhiwei Zhao's business.

**C. China Finance's description of its legal rights in the Langfang Investment was misleading because without disclosure that Langfang Development was owned by Zhao and Wang through**

**Strawmen, investors would not have known that China Finance was unlikely to exercise its legal rights.**

76. On April 29, 2013, China Finance filed its 2012 20-F. The 2012 20-F stated:

> C. Material contracts.
>
> ***In order to enhance our return on cash, on March 19, 2013***, we entered into a real estate investment contract (the "Investment Contract") with Langfang Shengshi Real Estate Development Co., Ltd. ("Langfang Developer") and four original shareholders of Langfang Developer (the "Original Shareholders"). Pursuant to the Investment Contract, at closing, we will invest an aggregate RMB135,000,000 (the "Investment Amount") in consideration for 49% of the equity interests in Langfang Developer. Langfang Developer shall use the Investment Amount to purchase a land and develop a real estate project thereon located in Langfang City, Hebei Province. We are entitled to terminate the Investment Contract if Langfang Developer loses the bid for the project land. The Original Shareholders pledged all of their equity interests in Langfang Developer to us to guarantee their performance under the Investment Contract. In connection with the Investment Contract, we entered into a shareholder agreement (the "SHA") with Langfang Developer and the Original Shareholders on even date thereof, pursuant to which, we have standard right of first offer, right of first refusal, right of co-sale and anti-dilution right in Langfang Developer. ***We are also entitled to a put option to require Langfang Developer to repurchase its equity interests held by us, if Langfang Developer fails to obtain the land use right of the project land within 12 months after the closing. If due to any reason the put option cannot be exercised, or the Original Shareholders fail to pay the consideration upon our exercise of the put option within 20 working days, we have the right to exercise a call option to purchase all of the equity interests in Langfang Developer held by its other shareholders at nil consideration.***
>
> Notwithstanding the Company's participation in the real estate project in Langfang, we do not intend to engage in real estate investment as part of our business operation [sic].

77. These statements were false and misleading for the reasons set out at ¶¶68-75 above. The statements were also misleading for omitting to disclose that

three of the initial investors, referred to in the statement as Original Shareholders, were in fact Strawmen who held their shares for Beijing Bluestone, a related party.

78. In addition, unbeknownst to investors, to exercise its legal rights under the Langfang Investment, China Finance would have to take legal action that affected Zhao and Wang. Wang and Zhao would effectively have to sue themselves. Thus, China Finance's description of its legal rights was materially misleading, because without knowing that Langfang Development was owned by Zhao and Wang, investors would not know that China Finance's contractual rights were limited.

79. The SEC's instructions to Form 20-F require that registrants publicly file all material contracts that must be performed on or after the filing date. SEC, Form 20-F, Instructions 4(a) to Exhibits (page 66).[9] Because the Langfang Investment was material, China Finance filed a purported summary of its contract with Langfang as Exhibit 430 to its 2012 20-F (the "Summary"), which was incorporated by reference into the 2012 20-F.

80. The Summary listed China Finance's rights under the Langfang contract; but, like the 2012 20-F, its description was misleading for omitting to disclose that Wang and Ling owned 75% of Langfang.

81. The SEC permits confidential information to be redacted from contracts pursuant to confidential treatment requests. But the SEC's guidance provides that "confidential treatment is generally not appropriate for information that is material to investors." SEC Div. of Corp Fin., Staff Legal Bulletin No. 1, *Confidential Treatment Requests*, February 28, 1997.[10] The identity of the Strawmen is a material fact, because, among other things, one of them is the chairman of the board of directors of Beijing Bluestone, a company owned by Zhao and Wang.

---

[9] Available at < https://www.sec.gov/about/forms/form20-f.pdf>.
[10] Available at < https://www.sec.gov/interps/legal/slbcf1r.htm.

82. China Finance nonetheless redacted the names of the Strawmen from the Summary.

**D. The 2012 20-F was materially misleading because it omitted to disclose that the Langfang Investment was a related party transaction.**

83. Langfang Development was a related party for each of the following four reasons:

a. Zhao indirectly owned at least 15% of Langfang Development through his investment in Beijing Bluestone and Beijing Bluestone's ownership of Langfang Development through Yan He, Haimin Xu, and Yiyong Wang.

b. Langfang Development and China Finance were under common control. Wang and Zhao each possessed the power to direct or cause the direction of both Langfang Development and China Finance, in that both companies were part of Wang and Zhao's business partnership.

c. China Finance had significant influence over Langfang Development. Through their indirect share ownership, Zhao and Wang could prevent Langfang Development from fully pursuing its own interests, rather than China Finance's; and

d. Langfang Development had significant influence over China Finance. Through Zhao, Langfang Development could prevent China Finance from fully pursuing its own interests, rather than Langfang Development's .

84. Thus, under GAAP, the Langfang Investment was required to be disclosed as a related-party transaction, and the failure to disclose the Langfang Investment as a related party transaction rendered the 2012 20-F misleading.

**E. J. Wang and Zhao made the material omissions in the 2012 20-F.**

85. Defendant J. Wang signed the 2012 20-F. Pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), Zhao and J. Wang each separately certified the 2012 20-F. Each of their certifications provided:

1. I have reviewed this annual report on Form 20-F of China Finance Online Co. Limited;

2. ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;***

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;

4. The Company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Company and have:

   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c) Evaluated the effectiveness of the Company's disclosure controls and

procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the Company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect,

5. The company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

86. Because the 2012 20-F contained omissions of material fact, the certifications of Zhao and J. Wang that the 2012 20-F did *not* contain materially false statements were itself false.

**F. China Finance made false statements in its earnings releases.**

87. On July 4, 2013, China Finance issued an earnings release announcing its Q1 2013 results (the "Q1 2013 Earnings Release"). The Q1 2013 Release stated:

> As of March 31, 2013, total cash, cash equivalents and restricted cash were $50.6 million and short-term investments were $1.0 million. Accounts receivable in non-margin related business was $8.5 million while iSTAR Finance had margin-related accounts receivables of $2.5 million. iSTAR Finance continues to implement strict margin account screening and ongoing monitoring to ensure the safe return of capital.

> As a result of the Company's participation in the Langfang City real estate project as disclosed in the fourth quarter earnings release, the long-term investment, net was $22.5 million as of March 31, 2013 compared with $0.8 million as of December 31, 2012.

88. The statements in the Q1 2013 Earnings Release referenced the false statements made in the 2012 Earnings Release. Because the 2012 Earnings Release's statements were false, and the Q1 2013 Earnings Release did not disclose that they were misleading, the Q1 2013 Earnings Release was misleading as well.

89. Identical statements were made in China Finance's Q2 2013 earnings release, published October 14, 2013, and its Q3 2013 earnings release, published January 2, 2014.

### G. Wang becomes sole owner of Beijing Bluestone; Wang and Zhao shuffle China Finance's stake in Langfang Development to Beijing Bluestone.

90. On July 23, 2013, Zhao transferred his interest in Beijing Bluestone to Wang.[11]

91. In November 2013, through a contract with Beijing Bluestone, China Finance sold its investment in Langfang Development (the "Langfang Transfer" and the "Langfang Transfer Agreement")).

92. The Langfang Transfer Agreement provided for an immediate transfer of China Finance's interest in Langfang Development to its two remaining shareholders, Beijing Bluestone and Langfang Great Sky, proportionally to their existing interest. Through the transfer, Beijing Bluestone became a 75% owner of Langfang Development. In exchange, the Langfang Transfer Agreement called for Langfang Development's remaining shareholders to pay RMB 152 million (about $24.9 million) to China Finance. Pursuant to the Langfang Transfer Agreement's terms, the first installment of RMB 100 million (about $16.4 million) was due in

---

[11] Source: Beijing Bluestone's SAIC Filings, corroborated by Tencent Exposé.

December 2013, and the remaining RMB 52 million (about $8.51 million) in March 2014. But instead of paying $16.4 million to China Finance in December 2013, Beijing Bluestone and Langfang Great Sky only paid $11.5 million. Then, Beijing Bluestone and Langfang Great Sky never made the second March 2014 payment to China Finance.

93. And at the same time as it entered into the Langfang Transfer Agreement, China Finance extended a $10.3 million loan to Langfang Development (the "Langfang Loan").

94. Thus, the net payment China Finance received for selling its stake in Langfang Development was $1.2 million.

95. China Finance first disclosed that it had sold its Langfang Investment on April 4, 2014, when it issued a press release announcing its 2013 financial results (the "2013 Earnings Release"). The 2013 Earnings Release misleadingly stated that China Finance had earned a profit in selling its Longfang Investment.

96. On May 6, 2014, China Finance filed its 2013 20-F. The 2013 20-F disclosed that China Finance (a) had sold the Langfang Investment for $24.9 million, (b) had collected $11.5 million from the sale, and (c) extended a $10.3 million loan to Langfang Development. The 2013 20-F also (d) stated that China Finance would be paid the remaining $24.2 million by September 2014. But the 2013 20-F *did not* disclose that the (e) Langfang Transfer Agreement had been breached and/or modified because it called for Langfang Development's shareholders to pay $4.9 million more than they did in December 2013.

97. The 2013 20-F also repeated the misleading statement that the purpose of the Langfang Investment had been to boost China Finance's return on its cash, which was false and misleading for the reasons set out at ¶¶68-75 above.

*After August 6, 2013, but before Langfang Transfer and Langfang Loan, the ownership of Bejing Bluestone and Langfang Development was follows:*




*After the Langfang Transfer and the Langfang Loan the ownership of Bejing Bluestone and Langfang Development was follows*

→ *Ownership*

- - - → *Contractual relationship*



### H. The 2013 20-F was materially misleading because it omitted to disclose that the Langfang Investment, the Langfang Transfer, and China Finance's loan to Langfang Development were all related party transactions.

98. Even after Zhao transferred his interest in Langfang Development, Langfang Development and Beijing Bluestone continued to be related parties of China Finance, for the following reasons:

a. Langfang Development, Beijing Bluestone, and China Finance were under common control. Wang and Zhao each possessed the power to direct or cause the direction of Langfang Development, Beijing Bluestone, and China Finance, in that all three companies were part of Wang and Zhao's informal partnership. *See* ¶¶36-42.

b. China Finance had significant influence over Langfang Development and Beijing Bluestone. Through Wang and Zhao's partnership, China Finance could prevent Langfang Development and Beijing Bluestone from fully pursuing their own interests, rather than China Finance's; and

c. Langfang Development and Beijing Bluestone had significant influence over China Finance. Through Wang and Zhao's partnership, Langfang Development and Beijing Bluestone could prevent China Finance from fully pursuing its own interests, rather than Langfang Development's and Beijing Bluestone's.

99. China Finance's counterparties in the Langfang Transfer included Beijing Bluestone. China Finance's counterparty in the Langfang Loan was Langfang Development.

100. Thus, the Langfang Transfer and the Langfang Loan were both related party transactions, which were required to be disclosed as related party transactions in China Finance's 2013 20-F, but were not, rendering the 2013 20-F misleading.

### I. J. Wang and Zhao each made the statements in the 2013 20-F; the SEC demands that China Finance publicly file the Langfang Transfer Agreement.

101. J. Wang signed the 2013 20-F. In addition, J. Wang and Zhao each signed SOX Certifications certifying the 2013 20-F that were substantially identical to those that had accompanied the 2012 20-F. In particular, each certification represented that "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." These statements were false for the reasons set out in ¶¶90-100, above.

102. The 2012 20-F explicitly stated that the Langfang Investment was a "material contract" which therefore had to be filed with the SEC. China Finance, however, did not attach the Langfang Transfer Agreement to its initially-filed 2013 20-F. Nor did China Finance file the Langfang Loan Agreement with its SEC filings. Nor did the 2013 20-F disclose that Beijing Bluestone was China Finance's counterparty in the Langfang Transfer Agreement, nor that it was a principal investor in Langfang Development.

103. In a letter dated September 29, 2014, the SEC instructed China Finance to disclose the name of the Langfang Transfer Agreement's counterparty:

> We note that you transferred your equity interest in the Langfang Developer for total consideration of $24.9 million in December 2013, of which $13.4 million is expected to be collected by September 20, 2014. ***Please tell us the name of the party to whom you transferred the equity interest and whether the party is a related party.***

104. The SEC's letter also asked China Finance why it had extended the maturity date on the consideration and loan due from Langfang Development:

> We also note that you extended the payment date of the consideration receivable and the maturity date of the loan made to Langfang Developer to September 20, 2014. ***Please tell us the reason for providing these extensions for both the consideration receivable and the loan. Please also***

> ***tell us whether the payments have been collected as of the most recent practicable date.***

105. In the same letter, the SEC also questioned China Finance's decision not to file the transfer agreement:

> Please tell us what consideration you gave to filing the agreements that govern the transfer of your equity stake in Langfang Developer. We refer you to Instruction 4(a) to the Exhibits to Form 20-F.

106. China Finance responded to the SEC in a publicly-filed letter dated October 31, 2014. The October 31 letter misleadingly and falsely represented that "The Company respectfully advises the Staff that [Beijing Bluestone] and Langfang Great Sky Investment Co. Limited are the parties to whom the Company transferred the equity interest in [Langfang Development] [which] ***are not related parties***" (emphasis added). The statement was false and misleading because, for the reasons set out above at ¶¶90-100, above, Beijing Bluestone was a related party.

### J. September 2014-June 2015: the fraud is disclosed in a series of corrective disclosures, while China Finance continues to give false reassurances.

107. On September 29, 2014, after close of trading, China Finance issued a press release announcing its results for the second quarter of 2014 (the "Q2 2014 Earnings Release"). The Q2 Earnings Release announced that as against Q2 2013, net revenues had increased by 171.4%, gross profit by 193.5%, and that its gross margin had increased from 67.9% to 73.5%.

108. The Q2 2014 Earnings Release, however, also disclosed that China Finance had not been paid any of the $24.2 million it was owed by Beijing Bluestone, Langfang Great Sky, and Langfang Development, and that China Finance had extended the due dates to December 2014:

> As previously disclosed by the Company, the Company's board of directors approved and authorized participation in a real estate investment project in Hebei, China in 2013 [i.e., the Langfang Investment]. By the end of 2013, the Company sold its entire ownership in the project and realized a US$2.8

> million gain. In addition, in December 2013, the Company provided a $10.3 million loan to the developer of the project in Hebei (the "Hebei Developer") with a monthly interest rate of 1.5%. The remaining consideration receivables and loan are secured by 100% of the Hebei Developer's equity. ***In September 2014, the Company's board of directors approved an extension of the outstanding loan and remaining consideration receivables for a period of three months.*** The Company expects to receive full payment on the loan and collect the remaining consideration receivables by the end of 2014.
>
> (Emphasis added).

109. One of the risks of a company's extending deals to related parties is that the company will not be willing or able to enforce its rights against the related parties. This risk materialized when China Finance was unable to, or chose not to, force Langfang Development and Beijing Bluestone to timely repay the $24.2 million they owed it.

110. The markets were alarmed that China Finance had not been able to collect any of the amounts that were owed to it, and on September 30, 2014, China Finance's stock price fell from $8.75/ADS to $6.87/ADS, or 21.5%, on heavy volume, damaging investors. On October 1, it continued to fall on heavy volume to $5.89/ADS, another 14%, damaging investors.

111. On December 15, 2014, Tencent, a major Chinese news business, published an exposé of the corruption of Wang, Zhao, and their sinister business associate, Wancheng Ling ("Ling") (the "Tencent Exposé"), which is incorporated by reference.

112. Ling is the brother of Jihua Ling ("J. Ling"), who was a top political advisor and confidante of former Chinese President Jintao Hu. In December 2014, J. Ling was placed under investigation for graft and removed from his official positions. He now faces criminal corruption charges. For his part, Ling fled to the

United States, and currently lives in a lavish home outside Sacramento. The PRC is reportedly attempting to secure his extradition. [12]

113. Although focusing on a corruption investigation of Ling, Wang, and Wancheng, the Tencent Exposé also exposed Wang and Zhao's business dealings. According to the Tencent Exposé, Ling and Wang were frequent business partners, co-owning together a substantial number of interrelated businesses. The Tencent Exposé specifically mentioned that Ling and Wang had been joint owners of Beijing Bluestone. Since China Finance had disclosed that Beijing Bluestone was the beneficiary of the Langfang Transfer Agreement, *see* ¶106 above, investors could deduce that it was a related party that owed China Finance $24.2 million.

114. Further, the Tencent Exposé disclosed that Wang had fled to

115. In response to the Tencent Exposé, on December 15, 2014, China Finance's stock price fell from $7.62/ADS to $6.58/ADS, or 13.6%, on heavy volume, damaging investors. On December 16, China Finance's stock price continued to fall to $5.70/ADS, or 13.3%, damaging investors.

116. On March 23, 2015, after close of trading, China Finance announced its Q4 2014 results (the "Q4 2014 Earnings Release"). As reported in the Q4 2014 Earnings Release, China Finance's amounts due from Langfang Development and Beijing Bluestone (reflected in its financial statements as loans receivable and consideration receivable) had not decreased,[13] showing that the $24.2 million had not been paid.

---

[12] *See* Michael Forsythe and Mark Mazzetti, China Seeks Businessman Said to Have Fled to U.S., Further Straining Ties, N.Y. Times Aug. 3, 2015, available at < http://www.nytimes.com/2015/08/04/world/asia/china-seeks-ling-wancheng-businessman-said-to-have-fled-to-us.html>.

[13] Except for minor changes arising from changes in the exchange rate between RMB and USD.

117. As a result of this bad news, on March 24, 2015, China Finance's stock price fell on heavy volume from $6.19/ADS to $4.58/ADS, or 26%, damaging investors.

118. On June 3, 2015, analyst firm GeoInvesting LLC[14] published a report on the website Seeking Alpha that sharply criticized China Finance (the "June 3 GeoInvesting Report").

119. The June 3 GeoInvesting Report published the SAIC filings of Langfang Development and Beijing Bluestone. The filings GeoInvesting published showed that (a) Beijing Bluestone was a substantial investor in Langfang Development, who by December 2013 owned 75% of it; (b) until July 2013, Zhao owned 20% of Beijing Bluestone; and (c) the remaining 80%, and after July 2013 all of it, was owned by Wang, who was a former director of China Finance and a close and frequent business partner and confidante of Zhao. The SAIC Filings thus showed that transactions with Langfang appeared to be related party transactions and were, in any case, deeply suspect.

120. As a result of the June 3 GeoInvesting Report, on June 3, 2015, China Finance's stock price fell on heavy volume from $5.95/ADS to $4.67/ADS, or 21.5%, damaging investors.

## VI. ADDITIONAL FACTS PROBATIVE OF SCIENTER

### A. China Finance's code of ethics expressly prohibits conflicts of interest.

121. At all relevant times, China Finance maintained a Code of Ethics For Senior Executive and Financial Officers (the "Code"). The Code applied to China Finance's CEO.

122. The Code prohibited company employees from engaging in joint ventures with China Finance without audit committee approval:

3. (c) Business Arrangements with the Company.

[14] GeoInvesting had a short position in China Finance's stock.

> Without the prior written approval of the Audit Committee, you may not participate in a joint venture, partnership or other business arrangement with the Company.

123. The Code similarly prohibited holding an interest in a company that does business with China Finance:

> 3. (b) You should avoid having an ownership interest in any other enterprise if that interest compromises or appears to compromise your loyalty to the Company. For example, you may not own an interest in a company that competes with the Company or that does business with the Company (such as a supplier) unless you obtain the written approval of the Chief Executive Officer before making any such investment.

**B. Defendants' response to the GeoInvesting Report included a series of false statements.**

124. On June 4, 2015, China Finance issued a response to the June 3 GeoInvesting Report. China Finance's response made several false exculpatory statements.

125. China Finance responded to GeoInvesting's claim that Langfang Development was a related party by stating:

> The investment in real estate project was fully disclosed. Langfang project was owned by 4 individuals when China Finance Online invested. Later, by the time that [Beijing Bluestone] started investing in Langfang project, Mr. Zhiwei Zhao was already no longer the shareholder of [Beijing Bluestone]. There was no related party transaction. There had been two partial repayments. The Company will pursue legal action if the full repayment is not completed.

126. Almost every statement in the paragraph was false or misleading: (a) when China Finance invested, Langfang Development was 75% owned by Beijing Bluestone, through the Strawmen; (b) Beijing Bluestone invested in Langfang Development *before* China Finance, but concealed its investment by using the Strawmen as nominal holders; (c) Zhao remained an on-the-books shareholder of Beijing Bluestone until July 2013, well past China Finance's investment, and continues in de facto control through his informal business partnership with Wang to this day; (d) the transactions were related-party transactions; (e) China Finance's

investment in Langfang Development was not fully disclosed, in that (among other things) China Finance omitted to file the Langfang Transfer Agreement, and had redacted the names of the Strawmen from its SEC filings. Moreover, (f) while Langfang Development had made a second payment after the December 2013 payment, the payment was for only $2.2 million. And while China Finance promised that it would sue Langfang Development if it did not pay, Langfang Development has not paid, and China Finance has not sued it.

127. Similarly, the June 3 GeoInvesting Report reiterated a claim made in the Tencent Exposé that Zhao had been forbidden from foreign travel when he became entangled in a corruption investigation. In response, China Finance's rebuttal stated that "[Zhao] had never been subject to restrictions on travel."

128. Yet according to a new June 4, 2015 article by Tencent, Zhao had not traveled since a December 6, 2015 flight from Shanghai to Beijing. Plaintiffs' investigator confirmed that while Zhao took one domestic flight after Tencent's June 4 article, Zhao's last foreign trip was a return flight to Los Angeles between February 4 and 27, 2014. It is implausible that the CEO of an international U.S.-listed company would not have occasion to leave China for more than 1.5 years.

### C. Defendants are caught up in a heavily publicized corruption investigation.

129. Since his elevation to the Presidency of the People's Republic of China, Xi Jinping has made fighting China's endemic corruption a priority. One of the campaign's focuses has been businessmen who exploit their own and associates' government connections for profit.

130. According to the Tencent Exposé, Wang and Zhao are closely linked to fugitive Ling. Ling and Zhao purportedly met when working for Xinhua News Agency, the PRC's official press agency. Wang, Zhao, and Ling, have continued to do business since, trading on Ling's political access. For example, all three were directors of Beijing Jifude Information Technology Co., Ltd, Ling may have sold

his shares in Huijin Lifang Investment Management Co. Ltd., one of his most substantial assets, to Wang, and one of Yee Care's most important partners is Xinhua.

131. Both Wang and Ling have fled China to escape prosecution for their corruption. And Leng has been detained for corruption.

132. For his part, Zhao has been subject to a travel ban that has prevented him from leaving China. Tencent's June 4 article further claimed that Zhao had requested an extended vacation from China Finance.

## VII. AUDITOR LIABILITY

133. Grant Thornton signed an audit report on China Finance's financial statements for the year ended December 31, 2013. Grant Thornton's audit report was included in China Finance's 2013 20-F.

134. Grant Thornton's audit report for the year ended December 31, 2013, provides:

> REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM
>
> Board of Directors and Shareholders
> China Finance Online Co. Limited.
>
> We have audited the accompanying consolidated balance sheets of China Finance Online Co. Limited, its subsidiaries, its variable interest entities ("VIEs") and its VIEs' subsidiaries (the "Group") as of December 31, 2013 and 2012, and the related consolidated statements of comprehensive income, changes in shareholders' equity, and cash flows for each of the two years in the period ended December 31, 2013. Our audit of the basic consolidated financial statements included the financial statement schedule listed in the index appearing under Schedule I. These financial statements and financial statement schedule are the responsibility of the Group's management. Our responsibility is to express an opinion on these financial statements and financial statement schedule based on our audits.

***We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States).*** Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. We were not engaged to perform an audit of the Group's internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Group's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

***In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of China Finance Online Co. Limited, its subsidiaries, its VIEs and its VIEs' subsidiaries as of December 31, 2013 and 2012, and the results of their operations and their cash flows for each of the two years in the period ended December 31, 2013 in conformity with accounting principles generally accepted in the United States of America.*** Also in our opinion, the related financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, present fairly, in all material respects, the information set forth therein. We also have audited the adjustments to the 2011 financial statements and financial statement schedule to retrospectively apply the change in accounting for the presentation of comprehensive income, as described in Note 2 to the consolidated financial statements. In our opinion, such adjustments are appropriate and have been properly applied. We were not engaged to audit, review, or apply any procedures to the 2011 financial statements and financial statement schedule of the Group other than with respect to such adjustments and, accordingly, we do not express an opinion or any other form of assurance on the 2011 financial statements or financial statement schedule taken as a whole.

/s/Grant Thornton
Beijing, People's Republic of China

May 6, 2014

135. BDO was China Finance's auditor for the year ended December 31, 2014. Its audit report, which was included in China Finance's 2014 20-F, provides:

> Board of Directors and Shareholders
> China Finance Online Co., Limited.
>
> We have audited the accompanying consolidated balance sheets of China Finance Online Co., Limited, its subsidiaries, its variable interest entities ("VIEs") and its VIEs' subsidiaries (the "Group") as of December 31, 2014 and 2013, and the related consolidated statements of comprehensive income, changes in shareholders' equity, and cash flows for each of the three years in the period ended December 31, 2014. Our audit of the basic consolidated financial statements included the financial statement schedule listed in the index appearing under Schedule I. These financial statements and financial statement schedule are the responsibility of the Group's management. Our responsibility is to express an opinion on these financial statements and financial statement schedule based on our audits.
>
> ***We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States).*** Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. We were not engaged to perform an audit of the Group's internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Group's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.
>
> ***In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of China***

> ***Finance Online Co., Limited, its subsidiaries, its VIEs and its VIEs' subsidiaries as of December 31, 2014 and 2013, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2014 in conformity with accounting principles generally accepted in the United States of America.*** Also in our opinion, the related financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, present fairly, in all material respects, the information set forth therein.
>
> BDO China Shu Lun Pan Certified Public Accountants LLP
> Beijing, China
> April 27, 2015

136. The emphasized statements in ¶¶ 134, and 135, are false and misleading for the reasons set out at ¶¶137-160, below.

**A. The Auditor Defendants did not conduct their audit in accordance with PCAOB Standards.**

137. The Auditor Defendants each claimed to have conducted their audits "in accordance with the standards of the Public Company Accounting Oversight Board (United States)" (the "PCAOB", and "PCAOB Standards"). They did not.

138. Among other more specific auditing standards, the AICP[15] established ten general, field work, and reporting standards that auditors must follow in order to be in compliance with GAAS. The third general standard states that "[d]ue professional care is to be exercised in the planning and performance of the audit and the preparation of the [auditors'] report." AU 230. "[D]ue professional care" requires an auditor to "exercise professional skepticism." AU 230.07. And "[p]rofessional skepticism is an attitude that includes a questioning mind and a critical assessment of audit evidence. The auditor uses the knowledge, skill, and ability called for by the profession of public accounting to diligently perform, in

[15] In April 2003, the PCAOB adopted the AICPA's pre-existing standards as its auditing standards, and they continue to be in effect to the extent they have not been superseded or amended by the PCAOB.

good faith and with integrity, the gathering and objective evaluation of evidence." *Id.*

139. AU 110 provides that "[t]he auditor has a responsibility to plan and perform the audit to obtain reasonable assurance about whether the **financial statements are free of material misstatement**, whether caused by error or fraud." AU 110.02[16] (emphasis added).

140. GAAP requires disclosure of all material related party transactions. Setting aside the need to disclose related-party transactions, "an understanding of the entity's related party relationships and transactions is relevant to the auditor's evaluation of whether one or more fraud risk factors are present, as required by [AU–C] section 240, because fraud may be more easily committed through related parties." AU-C 550.05, footnote omitted. The auditing standards stress that management's assertions about related parties have a higher inherent risk because management may have reasons to lie that are not present in describing most other business transactions. AU 9334.18[17].

141. AU 334, *Related Parties*, states that "the auditor should be aware that the substance of a particular transaction could be significantly different from its form and that financial statements should recognize the substance of particular transactions rather than merely their legal form." AU 334.02. AU-C 550 describes the two objectives of an auditor regarding related party relationships as to:

> a. obtain an understanding of related party relationships and transactions sufficient to be able to

---

[16] Citations to "AU __" are to the PCAOB's Interim Standards. Citations to "AS __" are to the PCAOB's permanent standards.

[17] While AS 18, Related Parties, superseded AU 334 and AU 9334 for audits effective after December 15, 2014. AS 18 did not materially change the previous auditing standards, but instead heightened auditor performance requirements associated with related party transactions.

> i. recognize fraud risk factors, if any, arising from related party relationships and transactions that are relevant to the identification and assessment of the risks of material misstatement due to fraud.
>
> ii. conclude, based on the audit evidence obtained, whether the financial statements, insofar as they are affected by those relationships and transactions, achieve fair presentation.
>
> b. obtain sufficient appropriate audit evidence about whether related party relationships and transactions have been appropriately identified, accounted for, and disclosed in the financial statements.
>
> AU-C 550.09.

142. The auditor must take several steps to identify related party relationships and transactions. *First*, the auditor must ask management for the identity of the Company's related parties, including whether the Company entered into any transactions with these related parties during the accounting period. AU-C 550.14.

143. While management's representations are a component of the evidential matter the independent auditor obtains, they, without additional testing performed by auditors, are not sufficient audit evidence. AU §333.02-03. Therefore, *second*, the auditor should follow a series of procedures designed to detect related parties, examples of which include:

> c. Review filings by the reporting entity with the Securities and Exchange Commission and other regulatory agencies for the names of related parties and for other businesses in which officers and directors occupy directorship or management positions.
>
> []

> e. Review stockholder listings of closely held companies to identify principal stockholders. [and]
>
> h. Review material investment transactions during the period under audit to determine whether the nature and extent of investments during the period create related parties.
>
> AU 334.07

144. *Third*, throughout the audit, the auditor should examine any significant transaction outside the entity's normal course of business; for any such transaction, the auditor should inquire of management to determine (i) the nature of the transaction; and (ii) whether related parties could be involved. AU-C 550.17. Auditing standards specifically draw the auditor's attention to any transaction for the provision of services under terms and conditions that are outside the entity's normal course of business. AU-C 550.A24.

145. The auditor should determine whether the transaction truly is a related party transaction, even if management denies that it is. To do so, for example, the auditor should examine the records or documents that may indicate the existence of related party relationships or transactions, such as the contracts that govern the transaction. AU C-550.A22. And a transaction that lacks an apparent logical business reason for its occurrence, or is inconsistent with other intentions the Company has outlined, should alert auditors that the transaction in question may have been made with a related party, as defined by GAAP, and detailed supra. AU-C 550.A41.

146. As a component of an audit of a Company's financial statements, the auditor should also consider the company's internal controls, because a company may not disclose related party transactions because it is not aware of related party disclosure rules. AU-C 550.15; AU-C 550.A18.

147. The terms of the Langfang Investment triggered the auditor's obligation to conduct diligence that would ultimately require the auditors to obtain

Beijing Bluestone's SAIC filings. *First*, the transaction was outside of the scope of China Finance's business. China Finance is a financial news service and brokerage firm; real estate investment is well outside its business scope. And in announcing the Langfang Investment, China Finance specifically stated that "[n]otwithstanding the Company's participation in the real estate project in Langfang, we do not intend to engage in real estate investment as part of our business operation." 2012 20-F, at 92.

148. *Second*, the terms of the Langfang Investment conflicted with China Finance's stated business purpose for entering into the transaction. In the very first 20-F that discussed the Langfang Investment, the 2012 20-F, China Finance stated that it "intend[ed] to preserve [its] cash balance as ample cash is critical for ensuring the success of [an ongoing] strategic transition." The Langfang Investment made China Finance the minority owner of an illiquid real estate development project. Indeed, at the time of China Finance's investment, Langfang Development had not even placed a bid to purchase the land necessary for the development. Thus, the Langfang Investment, by restricting China Finance's ability to access a substantial portion of its unrestricted cash during its transition, contradicted China Finance's stated goal in making the Langfang Investment.

149. *Third*, China Finance had suspiciously sought confidential treatment for the names of the individual investors in the Langfang Investment Agreement it publicly filed, but the Auditor Defendants had the right and the obligation under PCAOB Standards to review the unredacted version. The Langfang Investment Agreement stated that one of the investors was the chair of Beijing Bluestone's Board of Directors, an entity 20% owned by Zhao and 80% owned by Wang.

150. *Fourth*, China Finance had suspiciously failed to file the Langfang Transfer Agreement with the SEC. The Auditor Defendants had an obligation under PCAOB Standards to review it. The Langfang Transfer Agreement provided that the four initial investors in Langfang Development had all transferred their

interests within 5 months of China Finance's investment closing, three of them to Beijing Bluestone:

3. On July 16, 2013, *th*ree original shareholders of the Company *** transferred their respective shares in [Langfang Development] (each accounting for 12.75% the total share capital of [Langfang Development]) to the TRANSFEREE I [Beijing Bluestone] and had the change in equity registered with relevant [SAIC];
4. On August 16, 2013, the original shareholder of the Company *** transferred his equity in [Langfang Development] (accounting for 12.75% the total share capital of [Langfang Development]) to the TRANSFEREE II [Langfang Great Sky] and had the change in equity registered with relevant [SAIC];

151. Beijing Bluestone's own SAIC filings provide historical ownership information. They show that between February 2012 and July 22, 2013, Zhao owned 20% of Beijing Bluestone's shares, and Wang 80%; and that beginning July 23, 2013, Wang owned all of its shares. This information was readily available to BDO China and Grant Thornton.

152. *Fifth*, Beijing Bluestone and Langfang Development both failed to make payments required under the Langfang Transfer and Langfang Loan Agreements, yet China Finance did not sue them and continued to extend payment terms. China Finance also concealed that Beijing Bluestone had failed to make even the first payment required by the Langfang Transfer Agreement.

153. *Sixth*, regarding the planning of an audit, PCAOB Standards require that, the auditor should review "public information about the company relevant to the evaluation of the likelihood of material financial misstatements." AS No. 9.7. Though China Finance had publicly stated that Beijing Bluestone was not a related party, the Tencent Exposé had shown that Beijing Bluestone was an investment vehicle employed by Wang and Zhao. Accordingly, BDO, as auditor for China Finance's 2014 20-F, could not rely on any representation by management that Beijing Bluestone was not a related party.

154. *Seventh*, China Finance's 2013 20-F reported that it had a material weakness in internal controls, namely that its oversight of accounting for non-routine and complex transactions is inadequate:

> The Company's management determined that Company's oversight of complex transactions is not effective. Specifically, management lacks the expertise to evaluate the accounting requirement of certain non-routine and complex transactions. From time to time the Company will encounter non-routine accounting transactions that require a high level of technical accounting expertise. Non-routine accounting transactions will likely increase in frequency as the Company continues to grow and expand its operations.

155. *Eighth*, a series of public articles exposed the related party nature of many of the transactions involved here. For example, (a) the Tencent Exposé reported that Zhao was forbidden from leaving the country, and (b) a Sina January 11, 2015 article reported that Zhan, who China Finance represented was an unrelated Langfang Development investor alongside China Finance, was simultaneously a Beijing Bluestone representative on another venture. And Defendant Rongquan Leng, one of only three members of China Finance's audit committee, was taken into custody for corruption 10 days before the date of BDO's audit report.

156. *Ninth*, Beijing Bluestone was not present at its registered address, but the address was adjacent to Yee Care, a company owned by both Zhao and Wang.

157. All of these facts created an obligation on Grant Thornton and BDO's part to verify that the Langfang Investment, the Langfang Transfer, and the Langfang Loan were not made to related parties. Among other things, SAIC filings function as a catalog of share ownership of companies in the PRC. Under PCAOB Standards, AU 334.07, Grant Thornton and BDO had an obligation to review Beijing Bluestone's SAIC filings.

### B. The Auditor Defendants' statements that China Finance's financial statements were presented in accordance with GAAP was misleadingly incomplete.

158. "Without disclosure to the contrary, there is a general presumption that transactions reflected in financial statements have been consummated on an arm's-length basis between independent parties." SFAS No. 57 ¶ 15.

159. Wang was Zhao's business partner and a former director of China Finance. It is plain that China Finance's transactions with Wang were not consummated on an arm's-length basis.

160. Accordingly, China Finance's financial statements were misleading for failing to disclose that Beijing Bluestone was owned by Wang. And the Auditor Defendants' opinion that the financial statements were presented in accordance with GAAP was misleading for the same reason.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

161. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired China Finance ADS traded on the NASDAQ during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

162. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, China Finance securities were actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by China Finance or its transfer agent and may be notified

of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

163. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

164. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

165. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether the federal securities laws were violated by Defendants' acts as alleged herein;

b. whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of China Finance;

c. whether the Individual Defendants caused China Finance to issue false and misleading financial statements during the Class Period;

d. whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

e. whether the prices of China Finance ADSs during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and,

f. whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

166. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is

impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

167. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a. Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
b. China Finance regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services
c. the omissions and misrepresentations were material;
d. China Finance's ADSs were traded in efficient markets, in that:
    i. China Finance's ADSs traded on the NASDAQ, an automated and highly liquid market;
    ii. China Finance was covered by multiple analysts, including analysts Sadif Investment Analytics, EVA Dimensions, MCM Partners, and China Stock Research;
    iii. On average, 24% of China Finance's outstanding ADSs were traded weekly, permitting a very strong presumption of that its shares traded on an efficient market;
    iv. More than 20 market makers made a market in China Finance's ADS; and
    v. New company-specific information was rapidly reflected in China Finance's stock price.

168. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

169. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), because this action primarily alleges that omitted material information concerning related party transactions in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**COUNT I**

**Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Against China Finance, Zhao, J. Wang, BDO, and Grant Thornton**

170. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

171. This Count is asserted against China Finance, Zhao, J. Wang, BDO, and Grant Thornton (the "10b-5 Defendants") and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

172. During the Class Period, the 10b-5 Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of China Finance ADSs; and

(iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire China Finance ADSs and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, the 10b-5 Defendants, and each of them, took the actions set forth herein.

173. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the 10b-5 Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for China Finance ADSs. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about China Finance's finances and business prospects.

174. By virtue of their positions at China Finance or as China Finance's auditors, the 10b-5 Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, the 10b-5 Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to the 10b-5 Defendants. Said acts and omissions of the 10b-5 Defendants were committed willfully or with reckless disregard for the truth. In addition, each of the 10b-5 Defendants knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

175. Information showing that the 10b-5 Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of China Finance, Zhao and J. Wang had knowledge of the details of China Finance's internal affairs.

176. Zhao and J. Wang are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, Zhao and J. Wang were able to and did, directly or indirectly, control the content of the statements of China Finance. As officers and/or directors of a publicly-held company, Zhao and J. Wang had a duty to disseminate timely, accurate, and truthful information with respect to China Finance's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price for China Finance ADSs was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning China Finance's business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired China Finance ADSs at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by the 10b-5 Defendants, and were damaged upon the revelation of the alleged corrective disclosures.

177. During the Class Period, China Finance ADSs were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the 10b-5 Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of China Finance ADSs at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of China Finance ADSs was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of China Finance ADSs declined

sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

178. By reason of the conduct alleged herein, the 10b-5 Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

179. As a direct and proximate result of the 10b-5 Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

**COUNT II**

**Violation of Section 20(a) of The Exchange Act**
**Against The Individual Defendants**

180. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

181. During the Class Period, the Individual Defendants participated in the operation and management of China Finance, and conducted and participated, directly and indirectly, in the conduct of China Finance's business affairs. Because of their senior positions, they knew the adverse non-public information regarding China Finance's business practices.

182. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to China Finance's financial condition and results of operations, and to correct promptly any public statements issued by China Finance which had become materially false or misleading.

183. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various

reports, press releases and public filings which China Finance disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause China Finance to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of China Finance within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of China Finance ADSs.

184. Each of the Individual Defendants, therefore, acted as a controlling person of China Finance. By reason of their senior management positions and/or being directors of China Finance, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, China Finance to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of China Finance and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

185. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by China Finance.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post- judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: November 13, 2015

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/ Laurence M. Rosen
Laurence M. Rosen
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: lrosen@rosenlegal.com

Lead Counsel for Lead Plaintiffs

# Certification and Authorization of Named Plaintiff Pursuant to Federal Securities Laws

The individual or institution listed below (the "Plaintiff") authorizes and, upon execution of the accompanying retainer agreement by The Rosen Law Firm P.A., retains The Rosen Law Firm P.A. to file an action under the federal securities laws to recover damages and to seek other relief against China Finance Online Co., Ltd.. The Rosen Law Firm P.A. will prosecute the action on a contingent fee basis and will advance all costs and expenses. The China Finance Online Co., Ltd.. Retention Agreement provided to the Plaintiff is incorporated by reference, upon execution by The Rosen Law Firm P.A.

**First name:** Alan
**Middle initial:** N.
**Last name:** Beck
**Address:** REDACTED [redacted]
**City:**
**State:**
**Zip:**
**Country:**
**Facsimile:**
**Phone:**
**Email:**

Plaintiff certifies that:

1. Plaintiff has reviewed the complaint and authorized its filing.
2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.
3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.
4. Plaintiff represents and warrants that he/she/it is fully authorized to enter into and execute this certification.
5. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.
6. Plaintiff has made no transaction(s) during the Class Period in the debt or equity securities that are the subject of this action except those set forth below:

Acquisitions:

| Type of Security | Buy Date | # of Shares | Price per Share |
|---|---|---|---|
| Common Stock | 8/25/2014 | 2000 | 10.10 |

7. I have not served as a representative party on behalf of a class under the federal security laws during the last three years, except if detailed below. [ ]

I declare under penalty of perjury, under the laws of the United States, that the information entered is accurate: **YES**

**Certification for Alan Beck (cont.)**

By clicking on the button below, I intend to sign and execute this agreement and retain the Rosen Law Firm, P.A. to proceed on Plaintiff's behalf, on a contingent fee basis. **YES**

Signed pursuant to California Civil Code Section 1633.1, et seq. - and the Uniform Electronic Transactions Act as adopted by the various states and territories of the United States.

Date of signing: 06/11/2015



**CERTIFICATE OF SERVICE**

I hereby certify that on November 13, 2015, I filed the foregoing document through the Court's CM/ECF system, which sent notification of such filing to all counsel of record.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 13, 2015 /s/ Laurence M. Rosen